# CASE NO. 07-11134

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CQ, INC.,

  Plaintiff and Appellant,

v.

TXU MINING COMPANY LP,

  Defendant and Appellee.

On appeal from the United States District Court
for the Northern District of Texas, Dallas Division

## BRIEF OF DEFENDANT-APPELLEE
## TXU MINING COMPANY LP

Robert K. Wise (lead attorney)
Texas Bar No. 21812700
Thomas F. Lillard
Texas Bar No. 12352900
Miles B. Haberer
Texas Bar No. 00793872
HUNTON & WILLIAMS LLP
Fountain Place
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
214 • 979 • 3000
214 • 880 • 0011 Fax

ATTORNEYS FOR APPELLEE

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**CQ, INC.,**

**Plaintiff and Appellant,**

**v.**

**TXU MINING COMPANY LP,**

**Defendant and Appellee.**

---

**On appeal from the United States District Court
for the Northern District of Texas, Dallas Division**

---

**DEFENDANT-APPELLEE'S CERTIFICATE OF
<u>INTERESTED PARTIES</u>**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellant: CQ, Inc.

2. Plaintiff-Appellant's attorneys: James D. Jordan, LaDawn H. Conway, and David Mizgala, Munsch Hardt Kopf & Harr, P.C., 3800 Lincoln Plaza, 500 N. Akard Street, Dallas, Texas 75201-6659.

3.    Defendant-Appellee: TXU Mining Company LP, now known as Luminant Mining Company LLC.

4.    Defendant-Appellee's Attorneys: Robert K. Wise, Thomas F. Lillard, and Miles B. Haberer, Hunton & Williams LLP, Fountain Place, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202-2799.

_____
Attorney of Record for Defendant-Appellee

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**CQ, INC.,**

**Plaintiff and Appellant,**

v.

**TXU MINING COMPANY LP,**

**Defendant and Appellee.**

### On appeal from the United States District Court
### for the Northern District of Texas, Dallas Division

## DEFENDANT-APPELLEE'S STATEMENT REGARDING
## ORAL ARGUMENT

This is an appeal from a number of the District Court's rulings on the parties' cross motions for summary judgment and TXU's motions to exclude and limit CQ's damages evidence and expert. Oral argument will greatly assist the Court in understanding the bases for the rulings and why they are correct. Accordingly, TXU requests oral argument.

_____
Attorney of Record for Defendant-Appellee

# TABLE OF CONTENTS

DEFENDANT-APPELLEE'S CERTIFICATE OF INTERESTED PARTIES ..................................................................................................ii

DEFENDANT-APPELLEE'S STATEMENT REGARDING ORAL ARGUMENT ......................................................................................... iv

TABLE OF CONTENTS ............................................................................ v

TABLE OF AUTHORITIES ..................................................................viii

STATEMENT OF JURISDICTION ........................................................... 1

COUNTER-STATEMENT OF THE ISSUES ............................................. 2

STATEMENT OF THE CASE .................................................................... 3

    A.    Course of proceedings and disposition in the District Court. ................................................................................................. 3

    B.    Statement of facts. ............................................................................ 6

        1.    TXU's Request for Bids. .......................................................... 6

        2.    The RFB responses. .................................................................. 8

        3.    Addendum No. 1 to the RFB. ................................................. 10

        4.    TXU enters into preliminary discussions with CQ with the understanding that no decision had been made to engage CQ to build a cleaning plant, and that CQ would be paid its hourly rates for consulting work. ...................................................................... 11

        5.    TXU ends its relationship with CQ and asks CQ to submit an invoice for its services. ........................................ 14

        6.    TXU spends millions of dollars analyzing the benefits of coal cleaning. ....................................................... 14

SUMMARY OF THE ARGUMENT ........................................................ 15

ARGUMENT ........................................................................................... 20

A.  The District Court's denial of CQ's summary-judgment motion on its claim that TXU breached the Confidentiality Agreement must be affirmed. ..................... 20

B.  The District Court properly granted TXU summary judgment on CQ's sixth trade secret: CQ's recommendation that TXU clean the Twin Oak Mine's ROM lignite. ............................... 21

    1.  CQ failed to meet its summary-judgment burden. ................... 22

    2.  CQ's recommendation is not a trade secret under Texas law. ............................... 26

C.  The District Court correctly held that the alleged Alliance Agreement was barred by the statute of frauds. ............................... 28

    1.  There are no writings that satisfy the statute of the frauds. ............................... 29

    2.  The writings that CQ claims satisfy the statute of frauds are not sufficiently definite. ............................... 30

    3.  CQ's claim that it was defrauded is both wrong and wholly unsupported by any facts. ............................... 31

    4.  The partial-performance exception to the statute of frauds is inapplicable because CQ's performance is not unequivocally referable to the oral contract it is trying to enforce. ............................... 32

D.  CQ's fraud claim fails because the Alliance Agreement is barred by the statute of frauds. ............................... 36

E.  The District Court's decision to exclude Vollmar's opinions was not manifestly erroneous and thus was not an abuse of discretion. ............................... 36

    1.  Vollmar's opinions and reports. ............................... 37

    2.  Excluding Vollmar's trade-secret damages opinion was not manifestly erroneous because Vollmar did not know what CQ's trade secrets were and,

therefore, his opinion was irrelevant, unreliable, and speculative. .......................................................... 38

3. The District Court did not abuse its discretion in excluding Vollmar's opinion in the Second Report calculating damages for breach of the Confidentiality Agreement. ...................................... 45

    a. Vollmar's Second Report is irrelevant because the District Court correctly decided that TXU did not use CQ's ROM coal-cleaning recommendation. ............................. 46

    b. Vollmar's royalty damages methodology is inconsistent with Texas contract law. ............................ 47

4. The District Court did not err in excluding Vollmar's quantum meruit damage calculation. ..................... 50

F. The District Court did not abuse its discretion limiting CQ's "non-expert" damages evidence to the Invoice's $110,419.17 amount because that was the only "non-expert" calculation disclosed by CQ under Rule 26(a)(1)(C). ...................................................................... 52

1. CQ's damages disclosures. ................................................. 53

2. The District Court's ruling. ............................................... 53

    a. The District Court did not err when it ruled that CQ's only non-expert damages disclosure was the Invoice's $110,419.17 amount. ........................................................... 54

CONCLUSION ............................................................................. 57

CERTIFICATE OF SERVICE ....................................................... 58

CERTIFICATE OF COMPLIANCE ................................................ 59

# TABLE OF AUTHORITIES

## CASES

Adams v. Abbott, 151 Tex. 601, 254 S.W.2d 78 (1952) ............................. 29

In re Air Crash Disaster, 795 F.2d 1230 (5th Cir. 1986) ........................... 44

Beta Drilling, Inc. v. Durkee, 821 S.W.2d 739 (Tex. App. –
Houston [14th Dist.] 1992, writ denied) ................................................ 35

Betzel v. State Farm Lloyd's, 480 F.3d 704 (5th Cir. 2007) ............ 52, 55, 56

Campbell v. Keystone Aerial Surveys, Inc., 138 F.3d 996 (5th
Cir. 1998) ................................................................................................ 55

Chevalier v. Lane's, Inc., 213 S.W.2d 530 (Tex. 1948) ............................ 33

Conner v. Lavaca Hospital District, 267 F.3d 426 (5th Cir. 2001) ............. 29

Coulter v. Texaco, 117 F.3d 909 (5th Cir. 1997) ............................ 20, 21, 28

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ........................................ 2, 18, 36, 37, 38, 44, 50

Design Strategies, Inc. v. Davis, 367 F. Supp. 2d 630
(S.D.N.Y. 2005) ...................................................................................... 55

Document Imaging, Inc. v. IPRO, Inc., 952 F. Supp. 462
(S.D. Tex. 1996) ................................................................................. 28, 29

Empire Fire & Marine Insurance Co. v. Brantley Trucking,
Inc., 220 F.3d 679 (5th Cir. 2000) ......................................................... 20

Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429 (Tex. App.
– Dallas 2002, pet. denied) ....................................................... 32, 33, 34, 36

FDIC v. Mijalis, 15 F.3d 1314 (5th Cir. 1994) ........................................ 21

Fair Housing Council v. Riverside Two, 249 F.3d 1132 (9th Cir. 2001) .......................................................................... 24

Gaia Technology Inc. v. Recycled Prod. Corp., 175 F.3d 365 (5th Cir. 1999) ......................................................................... 22

Geiserman v. MacDonald, 893 F.2d 787 (5th Cir. 1990) ............................ 55

Georgia-Pacific Corp. v. United States Plywood, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2nd Cir. 1971) ....................................................................... 38, 39

Gulf Island, IV v. Blue Streak Marine, Inc., 940 F.3d 948 (5th Cir. 1991) ......................................................................... 26

Haase v. Glazner, 62 S.W.3d 795 (Tex. 2001) ............................................ 36

John Wood Group USA, Inc. v. ICO, Inc., 26 S.W.3d 12 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) .............................. 48

KW Plastics v. U.S. Can Co., 131 F. Supp. 2d 1289 (M.D. Ala. 2001) ....... 51

Lamajak, Inc. v. Frazin, 230 S.W.3d 786 (Tex. App. – Dallas 2007, no. pet. h.) .................................................................... 50

Magcobar North America v. Grasso Oilfield Services, Inc., 736 S.W.2d 787 (Tex. App. – Corpus Christi 1987), *writ dism'd by agr.*, 754 S.W.2d 646 (Tex. 1988) .............................................. 36

Malacara v. Garber, 353 F.3d 393 (5th Cir. 2003) ..................................... 23

Marks v. Pan America Airways, Inc., 785 F.2d 539 (5th Cir. 1986) ........... 44

Martco, Inc. v. Doran Chev., Inc., 632 S.W.2d 927 (Tex. App. – Dallas 1982, no writ) ...................................................................... 30

Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc., 416 F.3d 505 (6th Cir. 2005) ...................................................... 49

Mistletoe Export Service v. Locke, 762 S.W.2d 637 (Tex. App. – Texarkana 1988, no writ)................................................47, 48

Morrow v. Shotwell, 477 S.W.2d 538 (Tex. 1972).......................29

Nissho-Iwai America Corp. v. Kline, 845 F.2d 1300 (5th Cir. 1988)...........23

Overton v. Bengel, 139 S.W.3d 754 (Tex. App. – Texarkana 2004, no pet.)........................................29

Phillips v. Frey, 20 F.3d 623 (5th Cir. 1994)................................22, 28

Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002)................37

Qaddura v. Indo-European Foods, Inc., 141 S.W.3d 882 (Tex. App. – Dallas 2004, pet. denied)........................49

R.G. McClung Cotton Co. v. Cotton Concentration Co., 479 S.W.2d 733 (Tex. Civ. App. – Dallas 1972, writ ref'd n.r.e.)........................................47

Ragas v. Tennessee Pipeline Co., 136 F.3d 455 (5th Cir. 1998)................23

Rugen v. Interactive Business System, 864 S.W.2d 548..............28

Salgado v. General Motors Corp., 150 F.3d 735 (7th Cir. 1998)................52

Sikes v. McGraw-Edison Co., 665 F.2d 731 (5th Cir.), *reh'g denied*, 671 F.2d 150 (1982)........................26

Southmark Corp. v. Life Investors, Inc., 851 F.2d 763 (5th Cir. 1988).......30

Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp., 401 F. Supp. 1102 (E.D. Mich. 1975)........................49

United States v. Dunkel, 927 F.2d 955 (7th Cir. 1991)................24

University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. 1974)........................49

University of Pittsburgh v. Townsend, No. 3:04–cv–291,
2007 WL 1002317 (E.D. Tenn. Mar. 30, 2007) ...................................... 44

Vitor Corp. of America v. Hall Chemical Co., 292 F.2d 678 (6th
Cir. 1961) ............................................................................................ 49

Watkins v. Telsmith, 121 F.3d 984 (5th Cir. 1997) ................................... 37

Welch v. Coca-Cola Enterprise, Inc., 36 S.W.3d 532 (Tex. App.
– Tyler 2000, no pet.) ......................................................................... 32

Wilson v. Woods, 163 F.3d 935 (5th Cir. 1999) ........................................ 50

Wisconsin Electric Power Co. v. Public Services Commission,
329 N.W.2d 178 (Wis. 1983) .............................................................. 27

## STATUTES AND RULES

28 U.S.C. § 1291 ....................................................................................... 2

28 U.S.C. § 1332 ....................................................................................... 1

28 U.S.C. § 1441 ....................................................................................... 1

Fed. R. Civ. P. 37 .................................................................................... 52

Fed. R. Civ. P. 41 ........................................................................... 1, 3, 19

Fed. R. App. P. 32 ................................................................................... 59

5th Cir. R. 32.2 ........................................................................................ 59

5th Cir. R. 32.3 ........................................................................................ 59

Tex. Bus. & Com. Code § 26.01 .............................................................. 28

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1332(a)(1) and 1441(a) because (1) the amount in controversy exceeded $75,000, excluding interest and costs, and (2) there was complete diversity among the parties at the time the action was removed from Pennsylvania state court to the United States District Court for the Western District of Pennsylvania in that (a) CQ, Inc. was a Delaware corporation with its principal place of business in Pennsylvania, (b) TXU Mining Company LP was a Texas limited partnership and none of its general or limited partners were residents of Delaware or Pennsylvania, and (c) TXU Corp. was a Texas corporation with its principal place of business in Texas. (ROA 1:27-29).[1]

Following transfer to the District Court for the Northern District of Texas, CQ voluntarily dismissed TXU Corp. pursuant to Federal Rule of Civil Procedure 41. (ROA 11:2673). On October 24, 2007 the District Court entered a final judgment disposing of all of the claims. (ROA 12:2846-47). The next day, CQ filed its notice of appeal. (ROA 12:2849-50). Accordingly, this Court has

---

[1] The Record on Appeal will be cited as follows: "ROA [volume]:[page]." The sealed Record on Appeal will be cited as "SROA," and then be followed by the applicable docket number and page number. For example a citation to page 50 of docket number 89 would be "SROA Dkt. 89, at 50." Appellant's Offer of Proof will be cited as "OP [Exh.], at [page/exh.]." The October 19, 2007 hearing transcript will be cited as "Tr. Dkt. 234, at [page]." CQ's Brief will be cited as "Br. at [page]." The October 24, 2007 hearing transcript will be cited as "Tr. Dkt. 233, at [page]."

jurisdiction over this appeal under 28 U.S.C. § 1291 because it is an appeal from the District Court's final judgment.

## COUNTER-STATEMENT OF THE ISSUES

1.      Whether CQ can appeal the District Court's denial of its summary-judgment motion for breach of the Confidentiality Agreement and, if so, whether the District Court erred in denying the motion?  (Responding to CQ's Issue 1)

2.      Whether the District Court erred in granting TXU summary judgment on CQ's claim that TXU misappropriated one of its alleged trade secrets, *i.e.*, its recommendation that TXU clean only run-of-mine lignite at the Twin Oak Mine? (Responding to CQ's Issue 1)

3.      Whether the District Court erred in granting TXU summary judgment on CQ's claim for breach of an alleged Clean Coal Key Alliance Agreement based on the statute of frauds?  (Responding to CQ's Issue 1)

4.      Whether the District Court abused its discretion in excluding CQ's trade-secret damages expert, Ronald Vollmar, under Federal Rule of Evidence 702 and *Daubert*?  (Responding to CQ's Issue 2)

5.      Whether the District Court abused its discretion in excluding CQ's breach of the Confidentiality Agreement damages expert, Ronald Vollmar? (Responding to CQ's Issues 2 and 3)

6. Whether the District Court abused its discretion in excluding CQ's *quantum meruit* damages expert, Ronald Vollmar? (Responding to CQ's Issues 2 and 3)

7. Whether the District Court abused its discretion in limiting CQ's damages evidence to the amount it disclosed in its Federal Rule of Civil Procedure 26(a)(1)(C) disclosures? (Responding to CQ's Issues 4, 5, and 6)

## STATEMENT OF THE CASE

**A. Course of proceedings and disposition in the District Court.**

This action arises out of a November 2004 Request for Bids (the RFB) sent by TXU Mining Company LP n/k/a Luminant Mining Company LLC (TXU) to several companies, including CQ, Inc. (CQ), inviting them to submit proposals to build, own, operate, and maintain coal-cleaning plants at TXU's planned Twin Oak Mine and its existing Oak Hill Mine.[2] The RFB indicated that TXU was interested in a possible five-year contractual relationship. (SROA Dkt. 89, at 545). A later Addendum to the RFB indicated that TXU was contemplating a possible six-year contractual relationship. (SROA Dkt. 89, at 609).

The RFB informed the prospective bidders that, even after a successful bidder had been chosen, additional contract negotiations were possible. (SROA Dkt. 89, at 538). In addition, after selecting CQ, TXU emphasized on many

---

[2] TXU's existing and planned mines were all lignite mines. Lignite is a low-grade coal.

occasions that TXU had not yet decided to contract with CQ for the construction, ownership, operation, or maintenance of any lignite-cleaning plants. (SROA Dkt. 89, at 622, 624-25, 652, 659-61). Rather, TXU told CQ that it would pay CQ's hourly rates for any services or materials provided before TXU made such a decision. (SROA Dkt. 89, at 625, 659-61). CQ did not complain about the arrangement, and the parties even exchanged drafts of an interim services contract. (SROA Dkt. 89, at 622-27, 651-54). Despite their discussions, CQ and TXU never signed any contract – either an interim services contract or a contract for the construction, ownership, operation, or maintenance of any coal-cleaning plants.

By July 2005, TXU had decided to end its relationship with CQ. (SROA Dkt. 97, at 260). Although the parties had never signed an interim services contract, TXU recognized its obligation to pay CQ for the limited services it had provided. Accordingly, pursuant to TXU's request, CQ sent TXU a June 15, 2005 "itemized invoice" for $110,419.17 (the Invoice) "for [its] work under the Alliance." (SROA Dkt. 97, at 569-70). Because the Invoice passed through some third-party services, TXU questioned its amount. (SROA Dkt. 97, at 571). Before the parties could resolve their differences, CQ sued TXU in Pennsylvania state court for (1) breach of a five-year Clean Coal Key Alliance Agreement (the alleged Alliance Agreement or Alliance Agreement) that allegedly called for CQ to build, own, operate, and maintain coal-cleaning plants at TXU's Twin Oak and Oak Hill

4

mines, (2) breach of the parties' Confidentiality Agreement, (3) *quantum meruit,* (4) fraud, (5) conspiracy, (6) injunctive relief, (7) breach of fiduciary duty, (8) misappropriation of trade secrets, and (9) promissory estoppel. (ROA 4:751-70).

Following removal, the action was transferred to the District Court and the parties filed cross-motions for summary judgment. (ROA 1:27-30, 3:601). TXU's motion sought summary judgment on all of CQ's claims. (ROA 6:1255-1306). CQ's motion was partial, seeking summary judgment only on its claim for breach of the alleged Alliance Agreement, a "good-faith" contract, and the Confidentiality Agreement. (ROA 5:1220-47).

The District Court denied CQ's motion *in toto* and granted TXU (1) summary judgment on CQ's claim for breach of the alleged Alliance Agreement, holding that it was barred by the statute of frauds, (2) summary judgment on CQ's breach of fiduciary duty claim, and (3) partial summary judgment on CQ's fraud and misappropriation of trade secrets claims. (ROA 9:2166-68). TXU's motion with respect to CQ's other claims was denied, leaving CQ with claims for *quantum meruit*, promissory estoppel, breach of the Confidentiality Agreement, fraud, and misappropriation of trade secrets. (ROA 9:2166-68).

Shortly before trial, the District Court granted TXU's motions to (a) exclude CQ's damages expert, Ronald Vollmar, and (b) to limit CQ's damages evidence to the $110,419.17 set forth in the Invoice. (ROA 12:2840-42). CQ then agreed to

accept a $110,419.17 settlement payment from TXU and to dismiss, with prejudice, its claims for promissory estoppel and injunctive relief. (ROA 12:2846-47, Br. at 4).

Based on the District Court's evidentiary rulings and the parties' partial settlement, TXU, on the day of trial, moved for a take-nothing judgment on CQ's remaining claims for breach of the Confidentiality Agreement, misappropriation of trade secrets, *quantum meruit*, and fraud. (Tr. Dkt. 233, at 21). After CQ made an offer of proof solely relating to its damages evidence, the District Court granted TXU's motion and entered a take-nothing final judgment. (Tr. Dkt. 233, at 21). CQ timely filed this appeal. (ROA 12:2849).

## B.   Statement of facts.

### 1.   TXU's Request for Bids.

Coal cleaning broadly refers to any process that removes impurities in coal, such as rock, clay, quartz, and pyrite. Its benefits are well-known and include (1) increasing coal's heating value, or Btu content, (2) decreasing sulfur, sulfur dioxide, and mercury emissions, and (3) reducing a power plant's maintenance costs. (SROA Dkt. 89, at 193-94, 377-78).

In November 2004, TXU sent the RFB inviting many companies, including CQ, to submit proposals for a possible coal-cleaning project, which the RFB referred to as a "Clean Coal Technology Key Alliance." (SROA Dkt. 89, at 535).

The RFB indicated that TXU was considering a five-year contractual relationship, and the RFB's "scope of work" listed four possible components of the project: (1) a coal-cleaning plant at TXU's planned Twin Oak Mine, (2) a coal-cleaning plant at TXU's existing Oak Hill Mine, (3) coal-cleaning plants at other existing and future TXU mines, and (4) blending work to ensure that TXU's power plants received a proper mixture of lignite and Powder River Basin coal. (SROA Dkt. 89, at 545).

The RFB plainly stated that TXU intended to clean a mixture of "run-of-mine (ROM)" lignite and "waste," or "opportunity," lignite.[3] For example, the RFB indicated that TXU was looking at cleaning waste lignite "as well as a portion of run-of-mine" lignite at the Twin Oak Mine. (SROA Dkt. 89, at 545). The RFB also indicated that TXU planned to clean waste lignite at the Oak Hill Mine unless "energy recovery were proven that would make cleaning [ROM] tons cost effective." (SROA Dkt. 89, at 546).

The RFB cautioned that all bids could be *rejected*, and that, even after a "successful" bidder was selected *additional* negotiations over contract terms were possible. (SROA Dkt. 89, at 538). CQ read and understood these conditions. (SROA Dkt. 89, at 65).

---

[3] Lignite occurs in underground seams that vary in thickness. Lignite near the top and bottom of the seam often is so diluted that it cannot be burned at the power plant and is left in the mine. This type of lignite is commonly referred to as "opportunity" or "waste" lignite. ROM lignite is located in the middle of a seam, and it is cleaner and suitable for burning.

TXU invited the potential bidders to attend a pre-bid meeting in Dallas on November 17, 2004. At the meeting, which included CQ's representative, attendees asked questions about the project and each signed a Confidentiality Agreement. (SROA Dkt. 89, at 553-54). To be considered "confidential" under the Agreement, written information had to be expressly stamped as such or disclosed in a manner consistent with its "confidential" nature. (SROA Dkt. 89, at 553-54).

### 2. The RFB responses.

Three companies responded to the RFB. (SROA Dkt. 89, at 387). CQ's December 22, 2004 response (CQ's Initial Response) indicated that, if selected, CQ would form a subsidiary company, CQ Lignite LLC (CQL), to build, own, operate, and maintain a cleaning plant at the Twin Oak Mine and any facilities subsequently needed for the term of the Alliance. (SROA Dkt. 89, at 561). The response also provided that TXU and CQL would enter into two five-year contracts memorializing their arrangement: a Lease Agreement, pursuant to which CQL would rent property from TXU for $6,000 annually, and a Tolling Agreement, pursuant to which TXU would pay CQL $3.10 per ton of lignite cleaned. (SROA Dkt. 89, at 593-97). Notably, CQ's Initial Response was not designated "confidential" under the Confidentiality Agreement. (SROA Dkt. 89, at 16-17).

CQ's Initial Response recommended the use of an Allmineral air jig to clean the Twin Oak Mine's lignite. (SROA Dkt. 89, at 579). Air jigs were a well-recognized means of coal-cleaning when CQ's Initial Response was submitted, having been used for that purpose since the 1940's. (SROA Dkt. 89, at 377). In fact, Allmineral had made many presentations about the benefits of using air jigs to clean coal, including some to TXU before the RFB's issuance. (SROA Dkt. 89, at 216, 375-85, 674-78).

CQ's Initial Response contained two inconsistent recommendations for the Twin Oak Mine. On one hand, it recommended that TXU clean only its ROM lignite:

> [CQ] recommends that the initial cleaning plant target ROM lignite rather than waste lignite. When the Twin Oak mine is in full production, waste lignite can be sampled and, if indicated, cleaned on a test basis in the cleaning plant to determine yield and cleaning costs. Also, when the mine is in full production, the costs associated with loading-out can be accurately assessed. With this information, the cost and benefits of cleaning waste lignite can be assessed and if the assessment indicates a good economic potential to reduce the costs of fuel supplied to Big Brown, CQL will work with TXU to determine how best to implement the option of cleaning waste lignite.

(SROA Dkt. 89, at 568-69). The Response's next paragraph, however, inconsistently recommended that TXU clean *both* waste and ROM lignite at the Twin Oak Mine:

> One option to consider for increasing the recovery of lignite that would normally be wasted is to extract the waste lignite along with the ROM lignite and clean the entire output of the Twin Oak Mine. . . .

CQL engineers will work with TXU engineers and operations personnel to evaluate this option if desired by TXU.

(SROA Dkt. 89, at 569). The Initial Response did *not* make any recommendations about lignite cleaning at the Oak Hill Mine. (SROA Dkt. 89, at 586).

### 3.    Addendum No. 1 to the RFB.

In late 2004, TXU issued an "Addendum No. 1 - Second Call for Proposals (Addendum 1)." (SROA Dkt. 89, at 609). Addendum 1 modified the RFB in several respects. First, it suggested a six-year, rather than a five-year, contractual arrangement. (SROA Dkt. 89, at 609). Second, it assumed that the coal-cleaning plants at the Twin Oak and the Oak Hill mines would clean 720,000 tons of waste lignite and 280,000 tons of ROM lignite annually. (SROA Dkt. 89, at 609).

CQ responded to Addendum 1 on January 20, 2005 (CQ's Second Response). (SROA Dkt. 89, at 612). Consistent with Addendum 1's request, CQ's Second Response contemplated a six-year relationship. (SROA Dkt. 89, at 615). And, like CQ's Initial Response, CQ's Second Response identified CQL, rather than CQ, as the contracting party. (SROA Dkt. 89, at 614-15). Like CQ's Initial Response, no portion of CQ's Second Response was designated "confidential" or "proprietary" under the Confidentiality Agreement. (SROA Dkt. 89, at 103-04).

**4. TXU enters into preliminary discussions with CQ with the understanding that no decision had been made to engage CQ to build a cleaning plant, and that CQ would be paid its hourly rates for consulting work.**

After reviewing the Addendum 1 responses, TXU, on February 23, 2005, advised CQ that TXU had "made a decision to move forward with CQ, Inc. on the clean coal alliance project." (SROA Dkt. 89, at 9-10). During a March 11, 2005 conference call, TXU clarified the parties' relationship. After telling CQ that it had not yet decided to engage CQ to build a coal-cleaning plant at either mine, TXU offered to pay CQ its normal hourly rates for consulting services until such a decision was made. (SROA Dkt. 89, at 6-8, 659). CQ's acceptance of that arrangement was acknowledged in its President's March 11, 2005 written report to CQ's Board of Directors:

> Dave Akers and I had a conference call today with TXU to discuss the initial steps on the project. TXU still has not decided which plant will go first, so *they want us to consult with them* on that decision. We will do [so] and include our costs in the amortized capital for the first plant. TXU *will pay for our consulting work at hour normal hourly [sic], if they elect not to build a plant.*

(SROA Dkt. 89, at 659) (emphasis added).

Several weeks later, CQ's President again confirmed its consulting arrangement with TXU in another written Board report: "The TXU project is moving forward. *We provided our hourly rates to TXU* and the next steps are [sic]

*interim contract* and test demonstration of the air jig cleaning lignite in Mississippi." (SROA Dkt. 89, at 660) (emphasis added).

In mid-April 2005, the parties exchanged drafts of the interim services contract mentioned in CQ's President's second Board report. (SROA Dkt. 89, at 622, 651). The contract's first draft, which was prepared by TXU, was strictly for consulting services pursuant to which CQ would be paid on an hourly basis. (SROA Dkt. 89, at 622-27). The draft specifically disavowed the existence of a multi-year coal-cleaning agreement with CQ. The drafts "scope of work" clause, for instance, stated that CQ was to "[p]rovide preliminary engineering and design services in support of the *potential* alliance with [TXU] to develop and implement clean coal processes for [TXU's] lignite facilities." (SROA Dkt. 89, at 624) (emphasis added). The "compensation" clause similarly provided:

> It is understood by both parties that if the Clean Coal Key Alliance Agreement that is expected to result from this preliminary work fails to be established, then [TXU] agrees to pay [CQ] per the Compensation rates of this Agreement. *If the Clean Coal Key Alliance Agreement is established* . . . the costs accrued through this Agreement will be included in the resulting cost per ton of the Alliance Agreement. Both parties agree that no compensation will be provided to [CQ] through this Agreement, until such time that it has been determined that the Key Alliance will not be established.

(SROA Dkt. 89, at 624-25) (emphasis added). The "compensation" clause also set forth CQ's standard hourly rates, which were the rates mentioned in CQ's President's second Board report. (SROA Dkt. 89, at 625).

CQ's written comments on TXU's draft interim services contract also disavowed the existence of an Alliance Agreement in which CQ (or CQL) would build, own, operate, and maintain coal-cleaning plants. For example, they noted:

> While the agreement form works at this stage of the process, it will not work for the next stage of the process. I envision the Clean Coal Key Alliance Agreement as either a capital or operating lease, with take or pay provisions that will support financing. After the Key Alliance Agreement is signed, it is my understanding that [CQL] will build the plant for its own account under its own construction documents.

(SROA Dkt. 89, at 652). CQ's comments also proposed clarifying the draft interim services contract's "compensation" clause by inserting the following paragraph, which again acknowledged the absence of an Alliance Agreement:

> [TXU] and [CQ] are engaged in negotiations directed toward the execution of an agreement pursuant to which [CQ] or an affiliate of [CQ] will construct one or more coal cleaning or blending facility and provide clean coal to [TXU] on a take or pay basis (the "Clean Coal Key Alliance Agreement"). . . .
>
> *If the Clean Coal Key Alliance Agreement is not executed* and delivered on or before December 31, 2005, all amounts invoiced under this Agreement shall be immediately due and payable.

(SROA Dkt. 89, at 652-53) (emphasis added). Finally, CQ's comments on the draft interim services contract's "rights to data" clause, further demonstrates the lack of an Alliance Agreement: "TXU could use this term to justify its engagement of a third party to build the plant using CQ's drawings and intellectual property, particularly if [TXU] pays the full invoiced price and *no Clean Coal Key Alliance Agreement is executed*." (SROA Dkt. 89, at 653) (emphasis added).

**5.  TXU ends its relationship with CQ and asks CQ to submit an invoice for its services.**

TXU and CQ (or CQL) never signed a contract, either an interim services contract or an Alliance Agreement. Because CQ lacked any air-jig experience and because it had expressed displeasure over the lack of progress on an Alliance Agreement, TXU terminated its relationship with CQ in early July 2005. (SROA Dkt. 89, at 97-98, 650). Even though no contract had been signed, TXU recognized its obligation to pay CQ, on an hourly basis, for its consulting services. Accordingly, CQ, at TXU's request, submitted the Invoice. (SROA Dkt. 97, at 569-70).

**6.  TXU spends millions of dollars analyzing the benefits of coal cleaning.**

Several months before terminating its relationship with CQ, TXU had shipped some lignite to Mississippi for test-cleaning in a pilot air-jig. (SROA 89, at 660).[4] Encouraged by the results, TXU, after it terminated its relationship with CQ, brought the pilot air jig to the Oak Hill Mine for more extensive testing. (SROA Dkt. 89, at 390). Based on the tests, TXU purchased two full-size air jigs in April 2006 and constructed a "demonstration" cleaning plant at the Oak Hill Mine. (SROA Dkt. 89, at 390; Dkt. 88, at 2).

---

[4] Whereas a full size jig cleans fifty tons of coal per hour, the pilot jig only cleaned five tons per hour.

Through December 2006, TXU, at a cost of about $2.5 million, cleaned and analyzed more than 1600 lignite samples at the Oak Hill Mine demonstration facility. (SROA Dkt. 88, at 3). Based on the test results, TXU determined that cleaning ROM lignite from the Oak Hill Mine (1) significantly increased the lignite's heating value, thereby reducing the need to purchase Powder River Basin coal from Wyoming, (2) reduced sulfur and mercury emissions, and (3) reduced maintenance costs at the power plant in which it was burned. (SROA Dkt. 88, at 2-6). Thus, as clearly set forth in the RFB (*see* p. 7 *supra*), TXU decided to clean about 2.6 million tons of ROM and waste lignite at the Oak Hill Mine, using three Allmineral air jigs and two air tables manufactured by a Chinese company. (SROA Dkt. 88, at 2-6). TXU also decided not to clean any lignite at the Twin Oak Mine. (OP 556, at 18-22).

## SUMMARY OF THE ARGUMENT

This is an appeal from the District Court's June 29, 2007 Memorandum Order granting partial summary judgment to TXU (ROA 9:2130-68) and its October 24, 2007 order (ROA 12:2840-42) granting TXU's motion to exclude CQ's damages expert, Ronald Vollmar, and limiting CQ's damages evidence to $110,419.17, the only amount (other than those in Vollmar's inadmissible opinions) disclosed by CQ under Federal Rule of Civil Procedure 26(a)1)(C)(2).

**1. The District Court did not err in denying CQ summary judgment on its claim that TXU breached the Confidentiality Agreement.** This Court must affirm the District Court's ruling denying CQ's summary judgment on its breach of the Confidentiality Agreement claim for three reasons. First, the denial of a summary-judgment motion is not appealable. Second, CQ's argument on appeal, that is, that TXU breached the Confidentiality Agreement by using CQ's recommendation that it clean only ROM lignite, was not made in the District Court and, therefore, has been waived. Third, to the extent CQ is arguing that its recommendation that TXU clean only ROM lignite is the "confidential information" used by TXU in breach of the Confidentiality Agreement (and even if the Court were conclude that the argument was not waived), this argument fails because it is factually wrong. CQ's recommendation was limited to the Twin Oak Mine and it is undisputed that TXU is not cleaning *any* lignite there or only ROM lignite there or at any other mine. Further, the RFB specifically stated that TXU would clean ROM lignite at the Oak Hill Mine, if such cleaning were found to be cost-effective, which is exactly what occurred.

**2. The District Court properly granted TXU summary judgment on CQ's claim that TXU misappropriated CQ's sixth alleged trade secret, that is, that TXU clean only ROM lignite at the Twin Oak Mine.** The District Court's order granting TXU summary judgment on CQ's claim that TXU misappropriated

CQ's sixth alleged trade secret, that is, CQ's recommendation that TXU clean only ROM lignite at the Twin Oak Mine, should be affirmed for several reasons. At the outset, CQ's recommendation is not a trade secret under Texas law because (1) recommendations, like CQ's, do not fall within the definition of a "trade secret," and (2) it was a site-specific recommendation that has no continuing use to CQ in its business. Moreover, summary judgment was proper because, under controlling Fifth Circuit precedent, the non-movant must direct the District Court to summary-judgment evidence that creates a genuine issue of material fact. CQ's response did not do so. Rather, it wholly ignored TXU's argument that TXU did not follow CQ's recommendation. Also, the evidence that CQ claims creates a material fact issue simply does not do so.

**3.    The District Court properly granted TXU summary judgment on CQ's claim that TXU breached an alleged Alliance Agreement because the agreement was barred by the statute of frauds.** CQ's claim that TXU breached an alleged Alliance Agreement is barred by the statute of frauds for two reasons. First, the writings on which CQ relies to establish the agreement do not satisfy the statute of frauds because they clearly and unequivocally state that no Alliance Agreement had been made. Second, the partial-performance exception to the statute of frauds is not applicable because CQ's "performance" of the alleged Alliance Agreement is not unequivocally referable to it. To the contrary, it is more

17

consistent with performance of the interim services contract the parties were discussing.

**4.   The District Court did not abuse its discretion in excluding CQ's trade secret damages expert, Ronald Vollmar, based on *Daubert* and Federal Rule of Evidence 702.** The District Court's decision to exclude Vollmar's trade-secret damages testimony was not manifestly erroneous. The "Georgia-Pacific" test applied by Vollmar is fact specific. Vollmar could not have properly applied it, however, because he (1) did not know what any of CQ's alleged trade secrets, and (2) did not separately value each trade secret. Under the highly-deferential "manifestly erroneous" standard, the District Court's exclusion of Vollmar's trade secret damages opinion should be affirmed.

**5.   The District Court did not abuse its discretion in excluding Vollmar's damage opinion on CQ's breach of the Confidentiality Agreement claim.** The District Court's decision to exclude Vollmar's damage calculation based for breach of the Confidentiality Agreement was not manifestly erroneous and should be affirmed for two reasons. First, Vollmar's opinion is irrelevant because it was based on the assumption that TXU breached the Confidentiality Agreement by misappropriating CQ's sixth alleged trade secret, that is, CQ's recommendation that TXU clean only ROM lignite at the Twin Oak Mine. Because the District Court properly concluded that TXU had not adopted the

recommendation, there was no breach and no damages. Second, although Vollmar purported to calculate CQ's expectancy damages under the Confidentiality Agreement, he did not do so. To the contrary, in quantifying damages Vollmar simply made up his own contract terms.

**6. The District Court did not abuse its discretion in excluding Vollmar's damage opinion on CQ's *quantum meruit* claim.** The District Court's exclusion of Vollmar's *quantum meruit* damage calculation should be affirmed for two reasons. First, the District Court found that Vollmar was not qualified to testify about those damages, a decision CQ has not appealed. Second, the District Court properly concluded that CQ did not disclose Vollmar's *quantum meruit* opinion under Federal Rule of Civil Procedure 26(a)(1)(C).

**7. The District Court did not abuse its discretion by limiting CQ's "non-expert" damages evidence to $110,419.17.** The District Court's decision limiting CQ's damages to the Invoice's $110,419.17 amount should be affirmed because CQ failed to properly disclose any other admissible damages under Rule 26(a)(1)(C).

## ARGUMENT

**A.   The District Court's denial of CQ's summary-judgment motion on its claim that TXU breached the Confidentiality Agreement must be affirmed.**

Contending that the District Court erred by denying CQ's summary-judgment motion on its claim that TXU breached the Confidentiality Agreement (Brief at 17), CQ asks this Court to reverse the District Court's ruling and render judgment in its favor on that claim. This Court cannot do so for three reasons.

*First*, with few exceptions, none of which are applicable here, a district court's denial of a summary-judgment motion is not reviewable on appeal. *E.g., Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 681 n. 5 (5th Cir. 2000).[5]

*Second*, CQ has waived its argument because it was not made in the District Court. There, CQ argued that TXU breached the Confidentiality Agreement solely because, in May 2005, after TXU had selected CQ, two TXU analysts used CQ's allegedly confidential information to cut CQ out of the coal-cleaning project. (ROA 5:1235-37, 1245-46). Of course, CQ's argument on appeal is completely different. In its Brief (at 16-17), CQ claims that TXU breached the Confidentiality Agreement by adopting CQ's recommendation that it clean ROM lignite. By not

---

[5] Accordingly, there is no standard of review for a summary-judgment motion's denial. Of course, a grant of summary judgment is reviewed *de novo. Coulter v. Texaco*, 117 F.3d 909, 911 (5th Cir. 1997).

making this argument in its summary-judgment motion, CQ has waived it on appeal. *FDIC v. Mijalis,* 15 F.3d 1314, 1327 (5th Cir. 1994).

*Third,* to the extent CQ argues that its recommendation that TXU clean ROM lignite is the confidential information used by TXU in breach of the Confidentiality Agreement, this assertion fails because (a) it is untrue – CQ's recommendation was limited to the Twin Oak Mine and TXU is not cleaning any lignite there, and (b) the RFB specifically provided that TXU would clean ROM lignite at the Oak Hill Mine, if it were found to be cost-effective, which is exactly what occurred. (SROA Dkt. 88, at 1-10; OP 556, at 23-30).

## B. The District Court properly granted TXU summary judgment on CQ's sixth trade secret: CQ's recommendation that TXU clean the Twin Oak Mine's ROM lignite.

The District Court granted TXU partial summary judgment on CQ's trade secret misappropriation claim, including summary judgment with respect to CQ's sixth alleged trade secret – CQ's recommendation in its Initial Response that the cleaning plant at the Twin Oak Mine "target ROM lignite rather than waste lignite. When the Twin Oak mine is in full production, waste lignite can be sampled and, if indicated, cleaned on a test basis in the cleaning plant to determine yield and cleaning costs." (ROA 9:2162-63). This Court reviews a grant of summary judgment *de novo. Coulter,* 117 F.3d at 911.

To prevail on a misappropriation of trade secrets claim under Texas law, plaintiff must prove that: (1) it owns a trade secret, (2) the trade secret's disclosure was improperly acquired through a confidential or contractual relationship, (3) unauthorized use of the trade secret, and (4) damages. *Gaia Tech. Inc. v. Recycled Prod. Corp.,* 175 F.3d 365, 377 (5th Cir. 1999); *Phillips v. Frey,* 20 F.3d 623, 627 (5th Cir. 1994).

### 1. CQ failed to meet its summary-judgment burden.

In the District Court, TXU argued that summary judgment on CQ's sixth alleged trade secret was appropriate because TXU was not using CQ's recommendation that it clean only ROM lignite at the Twin Oak Mine. (ROA 6:1298-99). CQ's summary-judgment response wholly failed to address TXU's "no-use" argument or otherwise point the District Court to any summary-judgment evidence tending to create a material fact issue with respect to TXU's alleged use of CQ's recommendation. (ROA 6:1315-39). Simply put, CQ entirely ignored TXU's argument. Not surprisingly, the District Court held that there was no genuine issue of material fact concerning the element of use, and granted TXU summary judgment on CQ's sixth alleged trade secret. (ROA 9:2162-63).

On appeal, CQ contends that the District Court's summary judgment is erroneous because there was evidence in the summary-judgment record that created a material fact issue regarding whether TXU misappropriated CQ's sixth

alleged trade secret. (Br. at 20-21). Of course, even if that were true (and it is not), it is undisputed that CQ's summary-judgment response did not direct the District Court to that evidence, nor did it explain why, or how, any summary-judgment evidence created a material fact issue. (ROA 6:1315-39).

This Court has repeatedly held that it is the non-movant's burden to explain in its summary-judgment response why summary judgment is not warranted and to direct the district court's attention to any evidence that creates a material fact issue. "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it *in the response to the motion for summary judgment*, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (emphasis added); *Ragas v. Tenn. Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (Internal citation omitted)); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *accord, U.S. v.*

*Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ignoring the controlling precedent in this Circuit that requires the non-movant's summary-judgment response to direct the district court to the specific evidence that raises a material fact issue, CQ, instead, relies on *Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001), a case that has never been cited outside the Ninth Circuit, and argues that (1) evidence cited in CQ's partial summary-judgment brief (not in its response to TXU's summary-judgment motion) created a material fact issue regarding whether TXU misappropriated CQ's sixth alleged trade secret, and (2) the District Court erred in not considering such evidence. (Br. at 22-23).

CQ is wrong not only because the rule in *Fair Housing Counsel* is not the rule in this Circuit, but also more importantly because the evidence on which CQ relies does not create a fact issue regarding the misappropriation of CQ's sixth alleged trade secret. To the contrary, it *supports* the District Court's ruling. CQ claims that pages 1, 37, 150, and 169-171 of the Appendix in support of its partial summary-judgment motion (the Appendix) is evidence that TXU misappropriated its sixth alleged trade secret. Page 1 of the Appendix is the first page of TXU's December 2006 business case for the Oak Hill Mine cleaning plant. Nothing in the business case refers to TXU cleaning only ROM lignite at the Twin Oak Mine or

anywhere else. In fact, the business case does not even mention the Twin Oak Mine.

Page 37 of the Appendix is simply an excerpt from CQ's Initial Response. It is no evidence that TXU used CQ's sixth alleged trade secret at the Twin Oak Mine. (SROA Dkt. 88, at 37).

Page 150 of the Appendix is an excerpt from the deposition transcript of TXU's Del McCabe in which he described TXU's economic analysis and how it supported TXU's decision to clean ROM lignite at the Oak Hill Mine.[6] McCabe did not testify that TXU adopted CQ's ROM recommendation for the Twin Oak Mine. (SROA Dkt. 88, at 150).

Pages 169-171 of the Appendix are excerpts from the deposition transcript of TXU's Kasie Pickens in which she testified that TXU did not intend to clean *any* Twin Oak Mine lignite and that, elsewhere, TXU was analyzing the potential economic benefits of cleaning some ROM lignite. (SROA Dkt. 88, at 169-71).[7] Clearly, TXU has the right to analyze the benefits of cleaning ROM lignite.

---

[6] The original RFB stated that TXU would clean ROM lignite at the Oak Hill Mine if TXU determined it to be "cost effective." (SROA Dkt. 89, at 546). The Oak Hill business case describes how TXU determined that cleaning ROM lignite and waste lignite at Oak Hill Mine, in fact, would be cost effective. (SROA Dkt. 88, at 1-6).

[7] Although CQ contends that pages 101-105, 232, and 237 of the Appendix also create a fact issue, it fails to explain how it does so. More importantly, CQ is wrong because none of those documents demonstrate that TXU has adopted CQ's ROM-only cleaning recommendation.

In short, the "evidence" cited by CQ establishes that TXU never adopted CQ's recommendation that it clean Twin Oak Mine's ROM lignite. To the contrary, it demonstrates that TXU has no coal-cleaning plants at the Twin Oak Mine and has no plans to clean any lignite there. Thus, it does not create a material fact issue about whether TXU misappropriated CQ's sixth alleged trade secret.

## 2. CQ's recommendation is not a trade secret under Texas law.

This Court can affirm the District Court's summary-judgment ruling on any ground presented for consideration, "even though it may not have formed the basis for the district court's decision." *Gulf Island, IV v. Blue Streak Marine, Inc.*, 940 F.3d 948, 952 (5th Cir. 1991). In addition to its "no use" argument, TXU's summary-judgment motion argued that TXU was entitled to summary judgment on CQ's claim that it misappropriated CQ's sixth alleged trade secret for two other reasons. First, it argued that recommendations, such as CQ's for the Twin Oak Mine, are not trade secrets because, under Texas law trade secrets are limited to specific formulas, patterns, and processes. (ROA 6:1299). Second, TXU argued that it was entitled to summary judgment because CQ admitted that its recommendation was only beneficial to TXU and, under Texas law, information that relates to a single event is not a trade secret. (ROA 6:1286-91).

Texas has adopted the definition of "trade secret" set forth in Comment b to Section 757 of the *Restatement of Torts*. *E.g., Sikes v. McGraw-Edison Co.*, 665

F.2d 731, 733 (5th Cir.), *reh'g denied*, 671 F.2d 150 (1982). The Restatement

defines a trade secret as

> any *formula, pattern, device or compilation of information which is used in one's business*, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it . . . . It differs from other secret information in a business . . . in that it is not simply information as to *single or ephemeral events* in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract . . . . A trade secret is *a process or device for continuous use in the operation of the business*.

(emphasis added). In its summary-judgment response, CQ conceded that all of the

"information contained in [CQ's Initial Response and CQ's Second Response] was

a customized bid presentation, uniquely valuable to TXU." (ROA 6:1332). As a

result, CQ did not care whether the information in those documents fell into the

hands of its competitors or otherwise becomes publicly available. (ROA 6:1332).

CQ's engineers confirmed this in their depositions, noting the extreme

heterogeneous nature of coal and the site-specific nature of every cleaning plant.

(ROA 6:1289-91; SROA Dkt. 89, at 22, 78-79, 136-38, 154-55).

Because CQ's ROM cleaning recommendation was specific to a particular

location (the Twin Oak Mine), and because every coal-cleaning application is

unique, CQ's recommendation was not a trade secret under the Restatement

definition. *E.g., Wis. Elect. Power Co. v. Pub. Serv. Comm'n*, 329 N.W.2d 178,

182 (Wis. 1983) (holding that draft contracts, bids, and pricing and cost

information relating to a nuclear power plant were not trade secrets under the

Restatement's definition because they related solely to the purchase of services and equipment to be used in the construction of a specific nuclear power plant and thus reflected "information to single or ephemeral events in the conduct of the business"); *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994) (explaining that a trade secret is something that by definition gives its owner an opportunity to gain an advantage "over his competitors"); *Rugen v. Interactive Bus. Sys.*, 864 S.W.2d 548, 552 (a trade secret gives the owner an advantage over competitors).

In addition, the Restatement definition limits trade secrets to formulas, patterns, processes, or compilations of information. Thus, a "recommendation" or suggestion like CQ's ROM cleaning recommendation, do not fit. Accordingly, the District Court's summary-judgment ruling must be affirmed.

## C.    The District Court correctly held that the alleged Alliance Agreement was barred by the statute of frauds.

CQ's Complaint alleged that TXU "verbally accepted," and then breached, "CQ's offer to enter into a Clean Coal Key Alliance for a period of five years" and, accordingly, CQ claimed that it lost "five" years of profits. (ROA 3:729). TXU was granted summary judgment on this claim because it was barred by the statute of frauds. (ROA 9:2144). On appeal, the summary-judgment ruling is reviewed *de novo. Coulter*, 117 F.3d at 911.

**1. There are no writings that satisfy the statute of the frauds.**

The statute of frauds provides that an agreement that cannot be performed within one year is unenforceable unless it is in writing and signed by the person to be charged. Tex. Bus. & Com. Code § 26.01(a), (b)(6); *Document Imaging, Inc. v. IPRO, Inc.*, 952 F. Supp. 462, 467 (S.D. Tex. 1996). To satisfy the statute of frauds, the agreement must be evidenced by a written memorandum that is (1) complete within itself in every material detail, and (2) contains all of the essential elements of the agreement expressed with such certainty that they may be understood without resorting to oral testimony. *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 432 (5th Cir. 2001); *Document Imaging, Inc,* 952 F. Supp. at 467.

A valid memorandum may consist of more than one document. *Adams v. Abbott*, 151 Tex. 601, 254 S.W.2d 78, 80 (1952). If the memorandum consists of two documents, however, the second must refer to the first. *Morrow v. Shotwell,* 477 S.W.2d 538, 539 (Tex. 1972); *Overton v. Bengel,* 139 S.W.3d 754, 758 (Tex. App. – Texarkana 2004, no pet.).

In its Brief (at 27), CQ claims that the May 10, 2005 email from David Watkins asking for help drafting the interim services agreement, together with the Second Response, satisfies the statute of frauds. CQ is wrong because the email refers only to the interim services contract and not to the alleged Alliance Agreement. In fact, the email wholly disavows the existence of a binding Alliance

Agreement by noting that "[t]he intent is to *eventually form an Alliance* or a Partnership *Agreement* [with CQ]." (SROA Dkt. 88, at 137). It also points out that the alliance is not yet a "go project." (SROA Dkt. 88, at 137).[8] Further, the email not only asks for help in completing the interim services contract, but it also attaches both TXU's draft of the interim services contract, which disavows the existence of an Alliance Agreement and CQ's comments on the draft, which do the same. (*See* pp. 12-13 *supra*).

## 2. The writings that CQ claims satisfy the statute of frauds are not sufficiently definite.

The writings claimed to satisfy the statute of frauds must be sufficiently definite so that the terms of the agreement can be determined without resorting to oral testimony. CQ cannot meet this burden.

First, although CQ's Complaint accused TXU of breaching a *five-year* Alliance Agreement (ROA 3:729), CQ's contradictory briefing argues that the parties formed a six-year Alliance Agreement. (Br. at 25). Also, CQ's President believed that the Alliance Agreement had a six-year term. (SROA Dkt. 89, at 43).

A six-year term is consistent with CQ's Second Response's terms, whereas a five-year term is consistent with CQ's Initial Response. No documents relied on by CQ reconcile or even addresses this discrepancy.

---

[8] Of course, futuristic language does not satisfy the statute of frauds. *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 767 (5th Cir. 1988); *Martco, Inc. v. Doran Chev., Inc.*, 632 S.W.2d 927, 928 (Tex. App. - Dallas 1982, no writ).

### 3. CQ's claim that it was defrauded is both wrong and wholly unsupported by any facts.

Although CQ generally claims that TXU defrauded it by avoiding enforcement of the Alliance Agreement (Br. at 30), notably absent from CQ's Brief is reference to any evidence of harm, or damage, to CQ. It is undisputed that CQ never formed CQL, the entity its proposals stated would sign the Alliance Agreement. (SROA Dkt. 89, at 18). If CQ really believed that the parties had entered into an Alliance Agreement, clearly it would have formed CQL to perform it. Nor did CQ ever purchase a *single* piece of equipment for use in one of the cleaning plants that it contends it was to construct, own, operate, and maintain under the alleged Alliance Agreement. (SROA Dkt. 89, at 23).

Also, CQ's own words entirely belie CQ's fraud claim. CQ repeatedly admitted in writing that there was no Alliance Agreement. (SROA Dkt. 89, at 652-53). For example, its comments on TXU's draft of the interim services contract stated that the parties "are engaged in negotiations directed toward the execution of . . . the 'Clean Coal Key Alliance Agreement'. . . . If the Clean Coal Key Alliance Agreement is not executed and delivered on or before December 31, 2005, all amounts invoiced shall be immediately due and payable." (SROA Dkt. 89, at 652-53).[9] Similarly, CQ's President told CQ's Board that TXU was not bound to use

---

[9] Of course, CQ sent the Invoice because it knew that no Alliance Agreement had been entered into.

CQ to build a cleaning plant, a fact that is wholly inconsistent with an Alliance Agreement's existence. (SROA Dkt. 89, at 659).

**4. The partial-performance exception to the statute of frauds is inapplicable because CQ's performance is not unequivocally referable to the oral contract it is trying to enforce.**

CQ claims that its partial performance of the alleged Alliance Agreement requires its enforcement. (Br. at 30-31). CQ is wrong.

Under the partial-performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App. – Dallas 2002, pet. denied); *Welch v. Coca-Cola Enter., Inc.*, 36 S.W.3d 532, 539 (Tex. App. – Tyler 2000, no pet.). A virtual fraud arises when (1) there is strong evidence establishing the existence of an agreement and its terms, (2) plaintiff, in relying on the contract has suffered a substantial detriment for which it has no adequate remedy, and (3) defendant, if permitted to plead the statute of frauds, would reap an unearned benefit. *Exxon Corp.*, 82 S.W.3d at 439. For the exception to apply, however, "the partial performance must be unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.* In other words, "[t]he acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no

other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff." *Exxon Corp.*, 82 S.W.3d at 439-40; *accord, Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 534 (Tex. 1948) ("An act which admits of explanation without reference to the alleged oral contract or a contract of the same general nature and purpose is not, in general, admitted to constitute a part performance." (Internal citations omitted)).

*Exxon Corp. v. Breezevale Ltd.* is particularly instructive. There, Exxon requested Breezevale's assistance in obtaining oil exploration rights in Nigeria. To that end, Breezevale arranged appointments, conducted briefings, obtained information about available exploration blocks, and spoke with Nigerian officials on Exxon's behalf. As their relationship progressed, Exxon and Breezevale representatives met several times, with their last meeting occurring on April 3, 1992. During their previous meetings, the parties discussed two distinct types of contracts: a services contract and a participation agreement giving Breezevale a 2½ percent interest in Exxon's Nigerian oil production.

No formal contract was ever signed, and after Exxon terminated their relationship, Breezevale sued Exxon for breach of an alleged participation agreement. On appeal from a judgment in Breezevale's favor, the issue was whether the participation agreement was enforceable under the partial-performance

exception to the statute of frauds. Breezevale argued that it partially performed the agreement when one of its employees went to Nigeria immediately after the parties' last meeting. 82 S.W.3d at 439. Exxon argued the trip was not evidence of partial performance because it was more referable to the services agreement than the participation agreement. *Id.*

Initially, the Texas court of appeals noted that the partial performance applied only if the alleged performance was "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.* at 439. The court then reasoned that, because Breezevale's Nigerian trip could have been in performance of either the services agreement or the participation agreement, it was insufficient to establish partial performance of the participation agreement. *Id.* at 440. Thus, the Court reversed the judgment against Exxon for the participation agreement's breach. *Id.*

Here, as in *Exxon*, the partial-performance exception is inapplicable because CQ's alleged performance is not unequivocally referable to the alleged Alliance Agreement. For example, CQ argued in the District Court that it partially performed the Alliance Agreement "during and after" the March 23, 2005 kick-off meeting with TXU. (ROA 5:1240). It is undisputed, however, that CQ and TXU (like Exxon and Breezevale) were discussing and negotiating an interim services contract then. (SROA Dkt. 89, at 622-27, 651-54, 660). In fact, CQ's President

discussed the interim services contract in his (1) March 11, 2005 report to CQ's

Board, noting that "TXU will pay for our consulting work at our normal hourly

[sic], if they elect not to build a plant," and (2) April 1, 2005 Board report, which

not only mentioned the interim services contract, but advised the Board that CQ

had provided its hourly rates to TXU in anticipation of its execution. (SROA Dkt.

89, at 659-60).

Thus, like Breezevale's performance, CQ's is *not* unequivocally referable to

the oral agreement it is seeking to enforce – the Alliance Agreement. Rather, it

more consistent with performance of the interim services contract because the

work performed by CQ was not work envisioned under the alleged Alliance

Agreement's terms. (SROA Dkt. 89, at 612-21). Moreover, because CQ has taken

conflicting positions regarding the contract offer it is seeking to enforce, that is, the

five-year contract in CQ's Initial Response or the six-year contract in CQ's Second

Response, CQ's performance is not even unequivocally referable to one of them.

As CQ's alleged performance is not unequivocally referable to the alleged

Alliance Agreement, the partial performance exception is inapplicable. *Accord*

*Beta Drilling, Inc. v. Durkee,* 821 S.W.2d 739, 741 (Tex. App. – Houston [14th

Dist.] 1992, writ denied).[10]

---

[10] Although CQ suggests it would be a "virtual fraud" for TXU to avoid enforcement of
the Alliance Agreement, it fails to explain why this is so or to direct the Court to *any* evidence
suggesting that CQ suffered a substantial detriment for which there is no adequate remedy. In

Finally, CQ's reliance on the partial-performance exception is perplexing because even if the exception applies, CQ only is entitled to recover reliance damages, which is the amount necessary to restore CQ to the position it would have been in had it not performed. *Exxon Corp.,* 82 S.W.3d at 441; *see Magcobar N. Am. v. Grasso Oilfield Servs., Inc.,* 736 S.W.2d 787 (Tex. App. – Corpus Christi 1987), *writ dism'd by agr.,* 754 S.W.2d 646 (Tex. 1988). Clearly, the $110,419.17 Invoice represents CQ's reliance damages. Because TXU has paid that Invoice, in full, the partial-performance exception is moot.

**D.   CQ's fraud claim fails because the Alliance Agreement is barred by the statute of frauds.**

Relying on *Haase v. Glazner,* 62 S.W.3d 795, 799 (Tex. 2001), the District Court held that CQ's fraud claim was barred by the statute of frauds to the extent CQ, in connection with that claim, was seeking benefit-of-the-bargain damages under the alleged Alliance Agreement. As discussed above, the District Court's statute of frauds finding should be affirmed; consequently, its fraud ruling should be as well.

**E.   The District Court's decision to exclude Vollmar's opinions was not manifestly erroneous and thus was not an abuse of discretion.**

CQ claims the District Court's exclusion of the testimony and opinions of Ronald Vollmar, CQ's damages expert, under *Daubert v. Merrell Dow*

---

fact, there was no fraud as CQ was fully aware that there was no Alliance Agreement. *See* pp. 11-15 *supra.*

36

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702 is reversible error. Rulings excluding expert testimony are reviewed for abuse of discretion. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). In the Fifth Circuit, however, "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith*, 121 F.3d 984, 988 (5th Cir. 1997) (internal quotations omitted); *accord, Pipitone*, 288 F.3d at 239.

The Supreme Court's decision in *Daubert* provides the analytical framework for assessing the admissibility of expert testimony under Federal Rule of Evidence 702. Under *Daubert*, trial courts are "gate-keepers," making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Thus, expert testimony is admissible only if it is both relevant and reliable. *Pipitone*, 288 F.3d at 244.

## 1. Vollmar's opinions and reports.

Vollmar's opinions are set forth in his two written reports. (ROA 10:2300, 11:2655). Vollmar's January 31, 2007 report (Vollmar's First Report) purported to quantify damages in support of CQ's claims for breach of the Alliance Agreement and misappropriation of trade secrets. (ROA 10:2302). Vollmar's September 14,

2007 report (Vollmer's Second Report) purported to quantify CQ's expectancy, or benefit-of-the-bargain, for TXU's alleged breach of the Confidentiality Agreement. (ROA 11:2655).

Shortly before trial, TXU moved to exclude Vollmar's damages opinions based on *Daubert* and Rule 702. (ROA 10:2281, 11:2625). TXU also argued that Vollmar, an accountant with no coal-cleaning or engineering experience, was not qualified to testify about CQ's *quantum meruit* damages. (ROA 11:2296). The District Court granted both motions. (ROA 12:2841).

**2. Excluding Vollmar's trade-secret damages opinion was not manifestly erroneous because Vollmar did not know what CQ's trade secrets were and, therefore, his opinion was irrelevant, unreliable, and speculative.**

In quantifying damages in support of CQ's trade secrets misappropriation claim, Vollmar's First Report used the "Georgia-Pacific" methodology, a set of fifteen factors designed to determine the terms of a hypothetical license agreement between plaintiff and defendant at the time of the alleged misappropriation and pursuant to which the plaintiff would have granted the defendant a license to use its trade secrets. (ROA 10:2305-10). [11] Based on that methodology, Vollmar concluded that, in return for licensing CQ's trade secrets, TXU would have agreed to pay CQ a twenty-five percent royalty on all of its coal-cleaning profits. (ROA

---

[11] *See Georgia-Pacific Corp. v. U.S. Plywood*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2nd Cir. 1971).

10:2319). According to Vollmar, the royalty represents CQ's damages. (ROA 10:2319).

The Georgia-Pacific factors and, therefore, the resulting analysis are extremely fact-specific.[12] Their application clearly requires an expert to know

---

[12] The fifteen Georgia-Pacific factors are:

(1)     The royalties received by the [licensor] for the licensing of the [trade secret] in suit, proving or tending to prove an established royalty;

(2)     The rates paid the licensee for the use of other [trade secrets] comparable to the [trade secrets] in suit;

(3)     The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

(4)     The licensor's established policy and marketing program to maintain its [trade secret-related] monopoly by not licensing others to use the [trade secret] or by granting licenses under special conditions designed to preserve that monopoly;

(5)     The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business. . . . ;

(6)     The effect of selling the [trade secret] specialty in promoting sales of other products of the licensee; the existing value of the [trade secret] to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales;

(7)     The duration of the trade secret and the term of the license;

(8)     The established profitability of the product made under the [trade secret]; its commercial success; and its current popularity;

(9)     The utility and advantages of the [trade secret] property over the old modes or devices, if any, that had been used for working out similar results;

(10)     The nature of the [trade secret-related] invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the [trade secret];

what the alleged trade secret is. The first factor, for example, requires the expert to consider whether the hypothetical licensor (here CQ) has ever licensed the trade secret to anyone else and, if so, the amount of the license. The second factor requires the expert to consider the rates paid for comparable trade secrets. In addition, the test requires the expert to analyze and consider a host of other factors unique to the alleged trade secret, including: the hypothetical licensor's established policy and marketing program to maintain its trade secret-related monopoly (factor 4), the effect the trade secret has in promoting sales of other products and its existing value to the licensor (factor 6), the duration of the trade secret (factor 7),

---

(11)   The extent to which the infringer has made use of the [trade secret]; and any evidence probative of the value of that use;

(12)   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the [trade secret] or analogous inventions;

(13)   The portion of the realizable profit that should be credited to the [trade secret] as distinguished from non-trade-secret-related elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(14)   The opinion testimony of qualified experts; and

(15)   The amount that a licensor and a licensee would have agreed upon (at the time the misappropriation began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the trade secret - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensee who was willing to grant a license.

318 F. Supp. at 1120.

the established profitability, success, and popularity of any products made with the trade secret (factor 8), the extent to which the licensee has made use of the trade secret (factor 11), the trade secret's benefits both individually and/or as a part of some other product (factor 10), and the utility and advantages of the trade secret when compared with older technology (factor 9).

Notwithstanding the fact-specific nature of the Georgia-Pacific methodology, Vollmar admitted that he did not know what CQ's trade secrets were. Indeed, when asked, point-blank, he could not identify a single CQ trade secret:

> Q.   Okay. And what are CQ's trade secrets?
>
> A.   I couldn't tell you precisely. I know they have a lot of knowledge, but I couldn't tell you precisely what they are.
>
> . . . .
>
> Q.   I'm just simply asking you if you can identify the particular trade secrets that you say TXU should have to pay a 25 percent royalty rate on in this case. And, I mean, if you can identify them – If you can tell me what they are, then tell me. If not, I'll just move on.
>
> A.   Well, I think the answer to your question is that – is, no, that I cannot specifically identify what the trade secrets are. I know that they're in the area of the dry cleaning of coal.

(ROA 10:2334-35).[13] Of course, if Vollmar did not know what CQ's trade secrets were, he obviously could not have considered their value or assessed what role, if any, they may have played in the coal-cleaning process. And he certainly could not have applied the Georgia-Pacific methodology correctly.

Additionally, when deposed, Vollmar was asked how his valuation would change if any of CQ's trade secrets were found not to be trade secrets. Not having applied the Georgia-Pacific factors to any of them (ROA 10:2339), or otherwise having made any attempt to quantify each of their economic benefits, Vollmar, not surprisingly, could not answer the question:

> Q. . . . If the judge or jury were to determine that, say, three out of those ten were not trade secrets at all, how does that affect your 25 percent royalty rate?
>
> A. I don't know. I'd have to look at it.
>
> Q. How would you go about looking at it, just go back and do another analysis similar to what you've done already using those same factors, or what? Tell me how you would look at it.
>
> A. Well, I'd try to assess the economic benefit that is derived out of those trade secrets.

(ROA 10:2335).

---

[13] Although CQ claims that Vollmar did know what he was valuing, and that TXU has mischaracterized his testimony (Br. at 38), CQ does not cite to any evidence supporting that claim. It is difficult to understand how that could have happened when Vollmar's exact words were "I cannot specifically identify what the trade secrets are."

After the District Court held that nine of CQ's alleged trade secrets were not, in fact, trade secrets, Vollmar failed to quantify the value of CQ's sole remaining trade secret – CQ's operating and cost estimates – nor did he ever apply the Georgia-Pacific factors directly to it. (ROA 10:2301-20, 11:2655-64).

CQ, without citing to the record, argues that Vollmar's methodology was sound because he valued CQ's trade secrets "as a whole." (Brief at 37). But that is impossible. Vollmar could not have valued CQ's trade secrets "as a whole" because he did not know what any of them were. (ROA 10:2334-35). In fact, until his deposition, he did not even know there were ten trade secrets.[14]

CQ also claims that Vollmar, as a damages expert, is not required to understand, as would an engineer, the technical intricacies of the technology he is valuing. But this argument wholly ignores the District Court's ruling. The District Court's ruling was not that Vollmar had to understand the intricacies of CQ's trade secrets as an engineer would. Rather, its ruling was that the Georgia-Pacific methodology, because it is so fact-specific, simply requires the expert to gain a passing understanding of the trade secret he is purporting to value. If an expert does not even know what the trade secret is, the methodology has no value and the

---

[14] The bogus nature of Vollmar's analysis is illustrated by the fact that his First Report concluded that TXU would pay 25 percent of its coal-cleaning profits as a royalty for the use of all *ten* trade secrets, whereas Vollmar's Second Report concluded that TXU would pay a 20 percent royalty on TXU's profits for the use of only *one* of the ten trade secrets, the one which just happened to underlie CQ's claim that TXU breached the Confidentiality Agreement.

expert's resulting conclusions are unreliable and speculative. (ROA 10:2284-96, 12:2840-42).

Relying on *University of Pittsburgh v. Townsend*, No. 3:04-cv-291, 2007 WL 1002317 (E.D. Tenn. Mar. 30, 2007), an unpublished opinion, CQ argues that Vollmar properly could "bundle" CQ's alleged trade secrets. (Br. at 37). In *Townsend,* unlike here, plaintiff's expert at least knew the trade secret he was valuing. More important, the district court sanctioned his bundling approach because the evidence showed that plaintiff historically licensed its trade secrets as a package. Here, Vollmar neither knew what CQ's trade secrets were, nor did CQ historically bundle them.

To be admissible under Rule 702 and *Daubert,* expert testimony must be relevant, reliable, and capable of assisting the jury. While reliability and relevance do not require certainty, they must be demonstrated by evidence that the knowledge is more than speculation or conjecture. *Daubert,* 509 U.S. at 590; *Marks v. Pan Am. Airways, Inc.,* 785 F.2d 539, 542 (5th Cir. 1986); *In re Air Crash Disaster,* 795 F.2d 1230, 1234-35 (5th Cir. 1986).

Here, it was not erroneous, let alone manifestly erroneous, for the District Court to conclude that Vollmar's opinion was unreliable, irrelevant, and speculative after Vollmar admitted that he:

- did not know what he was valuing because he did not know what CQ's trade secrets were or anything about them;

- did not know what role, if any, the trade secrets might play in the coal-cleaning process;

- did not apply the fact-specific Georgia-Pacific methodology to each of CQ's trade secrets, including the only one that survived summary judgment – CQ's capital and operating cost estimates; and

- never quantified the economic value of CQ's capital and operating cost estimates even after acknowledging that he would need to do so if the District Court found that some of CQ's alleged trade secrets were not in fact trade secrets.

Accordingly, the District Court's exclusion of Vollmar's trade secret damages opinion should be affirmed.

### 3. The District Court did not abuse its discretion in excluding Vollmar's opinion in the Second Report calculating damages for breach of the Confidentiality Agreement.

Vollmar's Second Report purported to calculate CQ's "expectancy" or benefit-of-the-bargain damages for breach of the Confidentiality Agreement. (ROA 11:2655-64; Br. at 44). It purported to apply the Georgia-Pacific methodology to CQ's recommendation that TXU clean only ROM lignite at the Twin Oak Mine and concluded that TXU would have agreed to license the recommendation from CQ for a royalty equal to 20 percent of TXU's coal-cleaning profits for 10 years. (ROA 11:2655-64).

The District Court excluded Vollmar's royalty opinion for two reasons. First, it determined that his opinion was irrelevant because the court had already ruled that TXU had *not* used the ROM cleaning recommendation Vollmar

purportedly valued.  Second, it held that Vollmar's royalty methodology was unsupportable under Texas contract law.  (ROA 12:2840-41).

### a.     Vollmar's Second Report is irrelevant because the District Court correctly decided that TXU did not use CQ's ROM coal-cleaning recommendation.

Even though the District Court ruled that TXU did not misappropriate CQ's sixth alleged trade secret – CQ's recommendation that TXU clean only ROM lignite at the Twin Oak Mine – CQ contends that it erred in excluding Vollmar's Second Report, which quantified CQ's damages from TXU's use of that recommendation, because (1) Vollmar's Second Report purports to relate to damages for TXU's alleged breach of the Confidentiality Agreement, and (2) the District Court granted TXU's summary-judgment motion on CQ's claim for breach of the Confidentiality Agreement on a different issue:  whether various sketches were disclosed by TXU to other bidders.  CQ's argument, however, is nonsensical.

When the District Court ruled that TXU did not use CQ's ROM coal-cleaning recommendation, it necessarily foreclosed CQ from recovering any damages based on TXU's use of that recommendation.  As discussed above, *see* pp. 22-26 *supra*, the District Court's ruling is correct and should be affirmed. Consequently, Vollmar's royalty opinion is irrelevant to any issue on appeal, and the District Court properly excluded it.

### b. Vollmar's royalty damages methodology is inconsistent with Texas contract law.

CQ contends that Vollmar's Second Report calculated CQ's expectancy damages for TXU's breach of the Confidentiality Agreement. (Br. at 44). Under Texas law, contract damages generally fall into two categories – expectancy (or benefit-of-the-bargain) damages and out-of-pocket damages. *Mistletoe Exp. Serv. v. Locke,* 762 S.W.2d 637, 638 (Tex. App. – Texarkana 1988, no writ). Expectancy damages put plaintiff in the position it would have occupied had defendant performed the contract. *R.G. McClung Cotton Co. v. Cotton Concentration Co.,* 479 S.W.2d 733, 738 (Tex. Civ. App. – Dallas 1972, writ ref'd n.r.e.). If plaintiff's expectancy damages cannot be measured as if the contract had been performed, a plaintiff only can recover its out-of-pocket damages, that is, the dollar amount that puts the plaintiff in the position it would have occupied had the contract never been entered into. *Mistletoe Exp. Serv.,* 762 S.W.2d at 638.

Although Vollmar's Second Report purports to quantify CQ's expectancy damages for TXU's alleged breach of the Confidentiality Agreement, that is not what he did. Instead, after applying the Georgia-Pacific methodology, he calculated CQ's contract damages on a hypothetical licensing agreement pursuant to which TXU would pay a royalty equal to 20 percent of its coal-cleaning profits for ten years. (ROA 11:2655-64). In other words, instead of looking at the terms of the Confidentiality Agreement, which define one's contract expectancy, and

then quantifying the damages, if any, based on those terms, Vollmar simply made up his own contract terms based on a hypothetical, unwritten, never negotiated, multi-year licensing agreement. Those are not expectancy damages under the Confidentiality Agreement. *See John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 23 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) ("ICO argues that the breach [of the confidentiality provision] will support an award for lost benefit-of-the-bargain damages, but provides no authority for this assertion. . . . Absent some authority to the contrary, we hold that benefit-of-the-bargain damages are not available for breach . . . of the confidentiality provision.").

Because expectancy damages seek to put the plaintiff in the position it would have occupied had the contract been performed, the terms of the contract in question define a plaintiff's expectancy interest. *Mistletoe Exp. Serv.,* 762 S.W.2d at 638.[15] Accordingly, if anything, CQ's expectancy interest under the Confidentiality Agreement is set forth in paragraph 5 of the agreement, which authorized CQ, "in the event of a breach or threatened breach of the terms of this Agreement," to obtain an injunction prohibiting such breach. (SROA Dkt. 89, at 554).

---

[15] Of course, a ten-year license agreement is wholly inconsistent with CQ's responses to the RFB, which proposed first a five-year contract and then a six-year contract.

Although CQ contends that the methodology in Vollmar's Second Report is consistent with Texas law (Br. at 45), the cases CQ cites do not support its contention. For example, in *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005), *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F. Supp. 1102 (E.D. Mich. 1975), *Vitor Corp. of America v. Hall Chemical Co.*, 292 F.2d 678 (6th Cir. 1961), and *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974), the issue was how to value the plaintiffs' trade secrets under Ohio or Georgia law. *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882 (Tex. App. – Dallas 2004, pet. denied), also is not on point. There, defendant breached an agreement settling a trademark-infringement claim. Although the court acknowledged that the case involved a contract breach, it was careful to point out that the defendant's breach was "directly linked to trademark infringement." *Id.* at 889. Accordingly, it held that "[u]nder the facts of this case," the plaintiff should be entitled to recover damages under the Lanham Act. *Id.* Notably, the court did not consider whether the plaintiff was entitled to a reasonable royalty measure of damages, nor was it asked to decide whether plaintiff can recover contract damages based on a hypothetical, unwritten, and never negotiated licensing agreement. *Id.*

49

**4.    The District Court did not err in excluding Vollmar's *quantum meruit* damage calculation.**

In the District Court, TXU made two arguments why Vollmar should be precluded from testifying about CQ's *quantum meruit* damages. First, it argued that Vollmar was *not qualified*, under Rule 702 and *Daubert*, because he (1) was an accountant, not a mining engineer, (2) never worked for a mining or coal-cleaning company in any capacity, and (3) never had been involved in a coal-cleaning project of any sort. (ROA 10:2296-97).[16] In short, Vollmar has no coal, much less coal-cleaning, knowledge, experience, or expertise. (OP 554, at 7-8). Because the relevant inquiry in a *quantum meruit* action is the reasonable value of the services and material provided, *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 796 (Tex. App. – Dallas 2007, no. pet. h.), the District Court properly held, as TXU argued, that Vollmar was not qualified to testify about CQ's *quantum meruit* damages and properly excluded his testimony on them. (ROA 12:2841-42).

Second, TXU argued that Vollmar's testimony should be excluded because neither CQ's Rule 26 disclosures nor Vollmar's Reports indicated that he would opine about *quantum meruit* damages. (ROA 10:2296). The District Court agreed, and excluded his testimony on that basis as well. (ROA 12:2841).

---

[16] Under *Daubert* and Rule 702, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Federal Rule of Evidence 702). Thus, a "district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.*

On appeal, CQ claims that the District Court abused its discretion in excluding Vollmar's *quantum meruit* damage opinion. (Br. at 55-56). In doing so, it ignores the fact that the District Court excluded the opinion on two separate bases – first, that Vollmar was unqualified, and second, that CQ failed to disclose Vollmar's opinion. Rather, CQ only challenges the latter basis. Accordingly, the District Court's exclusion of Vollmar's opinion must be affirmed.

Just as important, CQ's argument that the District Court abused its discretion by excluding Vollmar's opinion because CQ's "only" obligation under Rule 26 was to disclose Vollmar's "computation" is wrong. Rule 26(a)(1)(C) requires plaintiff to disclose a computation for each of its damage "catetgor[ies]." Also, under Rule 26(a)(2)(B), Vollmar's reports were required to contain all of his opinions and the bases for them. Neither CQ's disclosures nor Vollmar's reports suggested that Vollmar would testify about CQ's *quantum meruit* damages. (ROA 10:2358-82, 10:2301-10, 11:2655-64). Furthermore, Vollmar, in his deposition, testified that he did not have an opinion about the value of any services CQ provided to TXU. (OP 555, at 8). Accordingly, the District Court did not abuse its discretion when it excluded Vollmar's *quantum meruit* damages opinion. *KW Plastics v. U.S. Can Co.,* 131 F. Supp. 2d 1289, 1296 (M.D. Ala. 2001) (holding that an expert's unjust enrichment calculations should be excluded under Rules

26(a)(2)(B) and 37 because his reports never indicated that he was going to testify about that type of damages).

**F.** **The District Court did not abuse its discretion limiting CQ's "non-expert" damages evidence to the Invoice's $110,419.17 amount because that was the only "non-expert" calculation disclosed by CQ under Rule 26(a)(1)(C).**

In addition to excluding Vollmar's opinions, the District Court, under Rule 37, limited CQ's "non-expert" damages evidence to the Invoice's $110,419.17 amount because that was the only "non-expert" calculation disclosed by CQ before the trial date. A district court's decision to exclude evidence under Rule 37 as a means of enforcing Rule 26(a)'s disclosure requirements is reviewed for abuse of discretion. *Betzel v. State Farm Lloyd's,* 480 F.3d 704, 707 (5th Cir. 2007).

Rule 26(a)(1)(C) required CQ to provide a "computation" for every "category" of damages that it is seeking to recover. Rule 37(c)(1) provides that a party who, "without substantial justification," fails to disclose such information "is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any . . . information not so disclosed." Rule 37's preclusionary sanction is generally automatic absent a determination of either "substantial justification" or "harmlessness." *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 742 (7th Cir. 1998). CQ, as the non-disclosing party, had the burden to demonstrate "substantial justification" or "harmlessness." *See* Fed. R. Civ. P. 37(c)(1).

52

### 1. CQ's damages disclosures.

CQ's Rule 26(a)(1)(C) disclosures consist of its "initial disclosures," its first and second "supplemented" disclosures, and Vollmar's Reports, which were incorporated by reference in CQ's disclosures. (ROA 10:2358-82). Read together, those documents provided five damage calculations: two calculations for CQ's damages from TXU's breach of the alleged Alliance Agreement, Vollmar's damage calculation for TXU's alleged misappropriation of CQ's trade secrets (contained in Vollmar's First Report), Vollmar's damage calculation for CQ's damages from TXU's alleged breach of the Confidentiality Agreement (contained in Vollmar's Second Report), and the Invoice representing the value of the goods and services CQ provided to TXU under CQ's *quantum meruit* claim. (ROA 10:2358-82, 10:2301-10, 11:2655-64, 10:2406-07).[17]

### 2. The District Court's ruling.

TXU argued that CQ's *quantum meruit* damages should be limited to the Invoice's $110,419.17 amount because that was the only amount disclosed by CQ under Rule 26. (ROA 10:2350-51). TXU also argued that CQ's damages for TXU's alleged breach of the Confidentiality Agreement should be limited to that

---

[17] TXU sought summary judgment on CQ's *quantum meruit* claim because CQ's disclosures failed to disclose any damages for it. (ROA 6:1277). In its response, CQ argued that the Invoice had been disclosed under Rule 26. (ROA 6:1334). The District Court ruled that CQ's failure to disclose, if any, was harmless because CQ had provided the Invoice to TXU before filing suit. (ROA 9:2146-47).

same amount because it was the only amount disclosed besides the inadmissible royalty calculation in Vollmar's Second Report. (ROA 10:2347-50). The District Court agreed, and ruled that CQ's damages evidence was limited to $110,419.17. (ROA 12:2841-42).

### a. The District Court did not err when it ruled that CQ's only non-expert damages disclosure was the Invoice's $110,419.17 amount.

Even though none of its disclosures refer to them, CQ argues on appeal that it properly disclosed, under Rule 26(a)(1)(C), the following non-expert damages evidence, and that if not for the District Court's ruling, it would have used this evidence to support its *quantum meruit* and Confidentiality Agreement claims:

- TXU pro formas estimating the net present value of coal cleaning at various locations between 2007 and 2021 (OP 542);

- TXU's business case estimating the potential value of a coal cleaning plant at Oak Hill Mine between 2007 and 2018 (OP 193, 194);

- the "Drake Model," a rudimentary analysis estimating the potential value of cleaning plants at numerous mines over a fifteen year period (OP 101);

- a mid-2005 contract proposal from CQ to TXU, and a draft counter-proposal from TXU (OP 64, 66); and

- a June 6, 2005 email from TXU's Matt Goering which stated that CQ would have to provide at least $3 million more in value to be considered for the Oak Hill cleaning plant (OP 129).

(Br. at 58). CQ's claim that it disclosed these damage computations under Rule 26 is false. None of these so-called damage calculations were disclosed by CQ.

(ROA 10:2358-82). Furthermore, Rule 26 mandates disclosure of a damage "computation" for every "category" of damages being sought. Consequently, for its *quantum meruit* and breach of the Confidentiality Agreement claims, CQ should have provided TXU with an actual damage calculation, or in other words, an explanation of how it arrived at the damages amount. It is undisputed that CQ did not meet this obligation. Clearly then, the District Court had the discretion to limit CQ's damages evidence to the Invoice's $110,419.17 amount. *E.g., Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 635 (S.D.N.Y. 2005) (holding that neither a statement in a complaint that the plaintiff was seeking lost revenues of at least $25 million nor financial statements produced by the plaintiff indicating plaintiff's standard profit on its contracts satisfied Rule 26).

The following factors are considered in determining whether the District Court abused its discretion: (1) CQ's explanation for the failure to make the required disclosure, (2) the importance of the evidence to CQ, (3) potential prejudice to TXU in allowing the evidence, and (4) the availability of a continuance to cure such prejudice. *Betzel,* 480 F.3d at 707; *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990); *Campbell v. Keystone Aerial Surveys, Inc.,* 138 F.3d 996, 1000 (5th Cir. 1998).

The first factor plainly favors TXU because CQ failed to offer any explanation to the District Court for its failure to disclose its "non-expert" damages

evidence. *Betzel*, 480 F.3d at 707 ("We take seriously this lack of explanation, having held, for example, that exclusion of expert witnesses is particularly appropriate where the party has failed to provide an adequate explanation." (Internal citation omitted)). In fact, on appeal, CQ still maintains that it complied with Rule 26(a)(1)(C). (Br. at 59).

The second factor – the importance of the excluded evidence – also favors TXU. CQ's argument that the District Court's ruling was harmful because it prevented CQ from offering any evidence at trial in support of its *quantum meruit* and breach of the Confidentiality Agreement claims is false. The District Court's ruling did *not* prevent CQ from offering any such evidence – it merely limited CQ's evidence to the Invoice's amount. Furthermore, it was not improper to limit CQ to the Invoice's amount because the Invoice itself stated that it was an "itemized invoice for [CQ's] work under the Alliance." (ROA 10:2406-07).

The third factor – the potential prejudice in allowing the evidence – favors TXU as well. Had the District Court not excluded the evidence, CQ would have blind-sided TXU at trial by arguing that it was entitled to all of TXU's coal-cleaning profits or a large portion of them as *quantum meruit* damages and/or damages for TXU's alleged breach of the Confidentiality Agreement. Recognizing the inherent unfairness of such an undisclosed argument, the District Court properly refused to allow CQ to offer its evidence. (Tr. Dkt. 234, at 43-45).

Finally, the fourth factor favors TXU because the ruling was made at the pre-trial hearing, and CQ readily could have asked the District Court for a short continuance to enable it to amend its damages disclosure and to allow limited discovery on the amendment. For whatever reason, CQ did not ask for one.

## CONCLUSION

For the foregoing reasons, the District Court's rulings and its final judgment should be affirmed.

Respectfully submitted,

**HUNTON & WILLIAMS LLP**

By: _____
Robert K. Wise
State Bar No. 21812700
bwise@hunton.com
Thomas F. Lillard
State Bar No. 12352900
tlillard@hunton.com
Miles B. Haberer
State Bar No. 00793872
mhaberer@hunton.com

Fountain Place
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
214.979.3000
214.880.0011 (Fax)

**ATTORNEYS FOR APPELLEE
TXU MINING COMPANY LP**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this brief was served on the following counsel of record by Certified Mail, Return Receipt Requested on April 18, 2008:

James D. Jordan
LaDawn Conway
Munsch Hardt Kopf & Harr P.C.
3800 Lincoln Plaza
500 N. Akard Street
Dallas, TX 75201-6659

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2 and .3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7).

EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. R. 32.3, THE BRIEF CONTAINS (select one):

_____ 13,663 words, OR

_____ lines of text in monospaced typeface.

THE BRIEF HAS BEEN PREPARED (select one):

in proportionally spaced typeface using:

      Software Name and Version: <u>Microsoft Word 2003</u>

      in (Typeface Name and Font Size): <u>Times New Roman 14 pt.</u>, OR

in monospaced (nonproportionally spaced) typeface using:

      typeface name and number of characters per inch:

_____

THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN FED. R. APP. P. 32(a)(7), MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

_____
Signature of filing party

59